760 F.2d 1428
 12 Collier Bankr.Cas.2d 1303, 12 Bankr.Ct.Dec. 1385,
Bankr. L. Rep. P 70,509
 In re Gerald David GLENN and Janice Sue Glenn, Debtors,
The FEDERAL LAND BANK OF LOUISVILLE, Creditor-Appellant,
v.
Gerald David GLENN and Janice Sue Glenn, (82-3821)
Debtors-Appellees.
In re Edward J. PIGLOSKI and Mary L. Pigloski, Debtors,
Edward J. PIGLOSKI and Mary L. Pigloski, Plaintiffs-Appellants,
v.
Maxine WYNN and Manor Mortgage Company, (83-1316)
Defendants-Appellees.
In re Ralph MILLER, Debtor,
FIRST FEDERAL OF MICHIGAN, Defendant-Appellant,
v.
Ralph Henry MILLER, (83-1585) Plaintiff-Appellee.
 Nos. 82-3821, 83-1316 and 83-1585.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 12, 1984.
Decided April 16, 1985.
Rehearing and Rehearing En Banc Denied in Nos. 83-1316 and
83-1585 June 3, 1985.
 
 Stephen R. Buchenroth (argued), Vorys, Sater, Seymour & Pease, Columbus, Ohio, for creditor-appellant in No. 82-3821.
 Robert A. Goering (argued) Wikle & Goering, Cincinnati, Ohio, for debtors-appellees in No. 82-3821.
 Mary Ann Zito (argued) UAW Legal Services Plan, Detroit, Mich., for plaintiffs-appellants in No. 83-1316.
 Edward R. Barton (argued), Allegan, Mich., amicus curiae.
 Ronald T. Barrows, St. Clair Shores, Mich., for defendants-appellees in No. 83-1316.
 Robert H. Skilton, III, Patrick E. Mears (argued), John D. Dunn, Grand Rapids, Mich., for amicus curiae (Appellees).
 W. Stanley Fambrough (argued), Detroit, Mich., for defendant-appellant in No. 83-1585.
 Matthew J. Mason, Detroit, Mich., for plaintiff-appellee in No. 83-1585.
 Edward R. Barton (argued), Allegan, Mich., amicus curiae.
 Before ENGEL and KRUPANSKY, Circuit Judges, WEICK, Senior Circuit Judge.
 ENGEL, Circuit Judge.
 
 
 1
 These three appeals raise similar questions about the point in the foreclosure process at which a Chapter 13 debtor loses the right to cure a default on a real estate mortgage on his principal residence.
 
 
 2
 In each case, the debtor gave a mortgage on real estate that was subject to foreclosure proceedings. In In re Gerald David Glenn, No. 82-3821, the debtors filed their Chapter 13 petition after the mortgagee had obtained a foreclosure judgment but before the property was sold. In In re Ralph Miller, No. 83-1585, and In re Edward J. Pigloski, No. 83-1316, the debtors filed their petitions after the properties had been sold at foreclosure sales but before the statutory redemption periods had run. The debtors in all three cases seek to protect their interests in the real estate by paying off any arrearages through their Chapter 13 plans and resuming the regular mortgage payments. The mortgagee in each case has objected that this treatment is contrary to the provisions of 11 U.S.C. Sec. 1322(b).
 
 
 3
 Each appeal also raises at least one additional issue. In Glenn, the debtors argue that, pursuant to 11 U.S.C. Sec. 1322(b)(2), their Chapter 13 plan may modify the rights of their creditor because the creditor's security interest is in a parcel that includes not only their principal residence, but also fifty acres of adjoining farmland. Should they not be permitted to reinstate the terms of their mortgages, the debtors in Miller and Pigloski seek a ruling that would toll the running of the statutory redemption periods for the duration of their Chapter 13 plans. The Pigloskis also claim that they should be allowed to spread the payment of the redemption amount over the entire length of their Chapter 13 plan while the debtor in Miller argues that the expiration of the redemption period following the foreclosure sale would constitute a preferential transfer that may be avoided under 11 U.S.C. Sec. 547(b).
 
 I.
 GERALD DAVID AND JANICE SUE GLENN (82-3821)
 
 4
 In October 1978 the Glenns bought their home and the fifty acres of land on which it is located in Fayetteville, Ohio. They made a $20,000.00 down payment and gave a first mortgage promissory note to the Federal Land Bank of Louisville to finance the balance of the purchase price. The Glenns also delivered a mortgage deed to the bank. The note required the payment of $2850.00 every six months and contained an acceleration clause giving the bank the option to declare the entire debt due and payable immediately should the Glenns fail to make any payments.
 
 
 5
 The Glenns subsequently failed to make some of the mortgage payments, and the bank accelerated the debt. When the Glenns failed to pay the accelerated amount, the bank commenced foreclosure proceedings. On December 18, 1981, the Court of Common Pleas of Brown County, Ohio entered a foreclosure judgment against the Glenns for $51,991.95. Later that same day, the Glenns filed their Chapter 13 petition with the bankruptcy court.
 
 
 6
 Under the terms of their Chapter 13 plan, the Glenns proposed to pay the bank the arrearage on the mortgage over a period of twenty-one months while maintaining current payments outside the plan under the original terms of the note. The bank objected to the plan, arguing that the note and mortgage had been merged and reduced to judgment and that the Glenns currently owed not just the amount they were in arrears but the entire judgment amount. The bankruptcy court overruled the bank's objection and confirmed the plan. Relying upon the rationale of the Second Circuit in In re Taddeo, 685 F.2d 24 (2d Cir.1982), the court held that 11 U.S.C. Sec. 1322(b)(5) permitted the Glenns to "deaccelerate" their mortgage and reinstate the original payment schedule.
 
 
 7
 The parties agreed to a direct appeal to our court pursuant to 28 U.S.C. Sec. 1293(b).
 
 RALPH MILLER (83-1585)
 
 8
 On August 5, 1980, Ralph Miller purchased a house in Detroit, Michigan, subject to an existing first mortgage, dated April 17, 1973, held by First Federal of Michigan. The sale price was $26,500.00, and the balance on the mortgage note was approximately $20,900.00.
 
 
 9
 Following repeated, lengthy lay-offs from his employment, Miller defaulted on the mortgage in 1981. First Federal commenced a foreclosure by advertisement in March 1982, and a sheriff's sale was held on May 14, 1982. First Federal purchased the property for a bid of the balance owing on the mortgage.
 
 
 10
 On November 2, 1982, before the statutory redemption period expired, Miller filed a Chapter 13 petition and plan. In his plan, Miller proposed to pay the arrearage on the mortgage and to maintain current payments on the note. Miller also moved the bankruptcy court to issue a stay order tolling the redemption period. The bankruptcy court denied the motion, denied confirmation of the plan, and lifted the automatic stay as to First Federal, allowing the mortgagee to pursue eviction.
 
 
 11
 Miller appealed these decisions to the district court, and the parties entered into a stipulation to stay proceedings pending appeal. Judge Thornton reversed the bankruptcy court, holding that 11 U.S.C. Sec. 1322(b)(5) permits a Chapter 13 debtor to set aside a foreclosure sale, pay any arrearage, and reinstate the terms of the mortgage when the petition is filed before the redemption period expires.
 
 
 12
 The parties entered into another stipulation to stay proceedings pending First Federal's appeal of Judge Thornton's decision.
 
 EDWARD J. AND MARY L. PIGLOSKI (83-1316)
 
 13
 In May 1981, Edward and Mary Pigloski sought to refinance their house by entering into a loan agreement arranged by Manor Mortgage Company. The house was encumbered by an existing mortgage of $14,500.00, which the mortgagee, Standard Federal Savings & Loan Association, had threatened to foreclose. Following the directions of Manor Mortgage Company, the Pigloskis incorporated themselves and signed a wrap-around mortgage and note to Maxine Wynn. The parties dispute the amount owed on the note, and the Pigloskis claim that it is actually usurious. In any event, the Pigloskis failed to make mortgage payments to Maxine Wynn.
 
 
 14
 Mrs. Wynn commenced foreclosure by advertisement under Michigan law in October 1981, and a sheriff's sale was held on November 20, 1981.
 
 
 15
 On April 30, 1982, before the statutory redemption period expired, the Pigloskis filed a Chapter 13 petition and plan. Under their plan, the Pigloskis proposed to pay, over a period of two and one half years, all the amounts they believed were legally due and owing to Mrs. Wynn. The Pigloskis also filed a motion for a stay order tolling the redemption period. The bankruptcy court eventually held that it had no authority to toll the statutory redemption period.
 
 
 16
 The Pigloskis appealed the decision to the district court. Judge Boyle held that the automatic stay of 11 U.S.C. Sec. 362(a) does not toll the statutory redemption period and that 11 U.S.C. Sec. 105 does not authorize a bankruptcy court to toll the redemption period. Judge Boyle also held that a foreclosure sale extinguishes the mortgage and, as a result, is not subject to cure under section 1322(b)(5).
 
 II.
 
 17
 11 U.S.C. Sec. 1322(b) outlines the permissible contents of a wage earner plan under Chapter 13 of the Bankruptcy Code. The relevant portions of that section provide:
 
 
 18
 (b) Subject to subsections (a) and (c) of this section, the plan may--
 
 
 19
 ....
 
 
 20
 (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims;
 
 
 21
 (3) provide for the curing or waiving of any default;
 
 
 22
 ....
 
 
 23
 (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;
 
 
 24
 ....
 
 
 25
 The mortgagees do not dispute that subsection (b)(5) permits a Chapter 13 debtor to cure a default on a long-term mortgage on the debtor's principal residence. However, they contend that once the long-term debt has been accelerated, or a foreclosure judgment has been obtained, or a foreclosure sale has occurred, the claim is no longer one "on which the last payment is due after the date on which the final payment under the plan is due" and, therefore, is not subject to cure under subsection (b)(5). Moreover, they argue that allowing the debtor to cure the default and reinstate the terms of the mortgage after any of these events would violate the language of subsection (b)(2), which prohibits modification of the rights of holders of claims "secured only by a security interest in real property that is the debtor's principal residence."
 
 
 26
 The courts disagree over whether and under what circumstances section 1322(b) allows a cure once a default on a mortgage has triggered acceleration of the debt, a judgment or a sale. The bankruptcy court in In re Ivory, 32 B.R. 788 (Bankr.D.Or.1983), grouped the differing viewpoints into the following general categories:
 
 
 27
 (1) Courts that hold that a debtor may not cure a default once a mortgage debt has been accelerated: In re Wilson, 11 B.R. 986 (Bkrtcy.S.D.N.Y.1981); Matter of LaPaglia, 8 B.R. 937 (Bkrtcy.E.D.N.Y.1981); In re Allen, 17 B.R. 119, 8 B.C.D. 945 (Bkrtcy.N.D.Ohio 1981).
 
 
 28
 (2) Courts that hold that a debtor may cure a default where the mortgage debt has been accelerated provided that no foreclosure judgment has been entered: Percy Wilson Mortgage & Finance Corp. v. McCurdy, 21 B.R. 535 (Bkrtcy.S.D.Ohio W.D.1982); In re Maiorino, 15 B.R. 254 (Bkrtcy.D.Conn.1981); In re Pearson, 10 B.R. 189 (Bkrtcy.E.D.N.Y.1981).
 
 
 29
 (3) Courts [that] hold that a debtor may cure a default where a state court judgment of foreclosure has been entered provided that no sale has taken place: In re Acevedo, 26 B.R. 994 (D.E.D.N.Y.1982); In re James, 20 B.R. 145, 9 B.C.D. 208 (Bkrtcy.E.D.Mich.1982); In re Brantley, 6 B.R. 178 (Bkrtcy.N.D.Fla.1980).
 
 
 30
 (4) Courts that place no express limitation on the debtor's right to cure a default after acceleration: In re Taddeo, 685 F.2d 24 (2nd Cir.1982); In re Sapp, 11 B.R. 188 (Bkrtcy.S.D.Ohio E.D.1981); In re Davis, 16 B.R. 473 (D.Kan.1981). Or after a judgment has been entered: In re Young, 22 B.R. 620 (Bkrtcy.N.D.Ill.E.D.1982); In re Breuer, 4 B.R. 499, 6 B.C.D. 136 (Bkrtcy.S.D.N.Y.1980).
 
 
 31
 (5) Courts that hold that a debtor may cure a default where a foreclosure sale has been held provided that the debtor's right of redemption under state law has not expired: In re Johnson, 29 B.R. 104 (Bkrtcy.S.D.Fla.1983); In re Chambers, 27 B.R. 687 (Bkrtcy.S.D.Fla.1983); In re Taylor, 21 B.R. 179 (Bkrtcy.W.D.Mo.1982); In re Thompson, 17 B.R. 748 (Bkrtcy.W.D.Mich.1982).
 
 
 32
 32 B.R. at 790. To the fourth group we add the following recent opinions by the Fifth and Seventh Circuits: Grubbs v. Houston First American Savings Association, 730 F.2d 236 (5th Cir.1984) (en banc) (holding that a debtor may cure a default after acceleration, but expressing no limit on the right); Matter of Clark, 738 F.2d 869 (7th Cir.1984) (holding that a debtor may cure a default after a judgment of foreclosure that does no more than judicially confirm the acceleration under state law, but expressing no opinion whether the right to cure survives a sale or a judgment of foreclosure in states where the effect of the judgment is different).
 
 
 33
 Most courts agree that section 1322(b)(5) allows the debtor to cure a default when the mortgagee has not yet accelerated the debt, see, e.g., In re Pearson, 10 B.R. at 193; In re Hartford, 7 B.R. 914 (Bankr.D.Me.1981), and that the debtor may not reinstate the mortgage if the bankruptcy petition is filed after the state redemption period has expired, see, e.g., In re Ivory, 33 B.R. at 791; In re Thompson, 17 B.R. at 751.
 
 
 34
 The legislative history of section 1322(b) is ambiguous about the scope of the right afforded the debtor to cure a mortgage default. To encourage consumer debtor rehabilitation rather than liquidation, Congress designed Chapter 13 of the Bankruptcy Code to provide greater relief than was available under the former Bankruptcy Act. H.R.Rep. No. 595, 95th Cong., 1st Sess. 116-17 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6076-78. The House Report further explains the chapter's general purpose:
 
 
 35
 The purpose of chapter 13 is to enable an individual, under court supervision and protection, to develop and perform under a plan for the repayment of his debts over an extended period. In some cases, the plan will call for full repayment. In others, it may offer creditors a percentage of their claims in full settlement. During the repayment period, creditors may not harrass [sic] the debtor or seek to collect their debts. They must receive payments only under the plan. This protection relieves the debtor from indirect and direct pressures from creditors, and enables him to support himself and his dependents while repaying his creditors at the same time.
 
 
 36
 The benefit to the debtor of developing a plan of repayment under chapter 13, rather than opting for liquidation under chapter 7, is that it permits the debtor to protect his assets. In a liquidation case, the debtor must surrender his nonexempt assets for liquidation and sale by the trustee. Under chapter 13, the debtor may retain his property by agreeing to repay his creditors. Chapter 13 also protects a debtor's credit standing far better than a straight bankruptcy, because he is viewed by the credit industry as a better risk. In addition, it satisfies many debtors' desire to avoid the stigma attached to straight bankruptcy and to retain the pride attendant on being able to meet one's obligations. The benefit to creditors is self-evident: their losses will be significantly less than if their debtors opt for straight bankruptcy.
 
 
 37
 Id. at 118, U.S.Code Cong. & Admin.News 1978, p. 6079.
 
 
 38
 One of the significant specific changes introduced by Congress in the new legislation was to allow modification of the contract rights of secured creditors under a Chapter 13 plan. H.R.Rep., supra, at 124; Bankruptcy Laws Commission's Report, H.R.Doc. 137, pt. 2, 93rd Cong., 1st Sess. 205 (1973). Nevertheless, it is evident upon examining the final language of section 1322(b)(2) that Congress contemplated a different treatment of debts secured only by mortgages on the debtor's principal residence.
 
 
 39
 One would think that when trying to liberalize the relief to debtors under Chapter 13, Congress would be particularly solicitous of the individual wage earner's ability to save his home. However, it is apparent from the language of section 1322(b) that Congress intended to give a preferred status to certain types of home mortgagees and lienholders, a policy which at first blush would seem at odds with the general thrust of the new act. The question naturally arises: why?
 
 
 40
 The legislative history says little in terms of political or social philosophy as such. However, it does reveal that the final language of section 1322(b) evolved from earlier language, incorporated in the bill apparently at the behest of representatives of the mortgage market,[1] that would have prohibited modification of the rights of all creditors whose claims were wholly secured by mortgages on real property. Although the earlier language did not survive, the statute as finally enacted by Congress clearly evidences a concern with the possible effects the new bankruptcy act might have upon the market for homes. If any other policy objective of Congress was adequate to compete against the objective of protecting wage earners generally, it was a policy to encourage the increased production of homes and to encourage private individual ownership of homes as a traditional and important value in American life. Congress had to face the reality that in a relatively free society, market forces and the profit motive play a vital role in determining how investment capital will be employed. Every protection Congress might grant a homeowner at the expense of the holders of security interests on those homes would decrease the attractiveness of home mortgages as investment opportunities. And as home mortgages decrease in attractiveness, the pool of money available for new home construction and finance shrinks.
 
 
 41
 On the other hand, Congress was determined not to depart too far from its expressed policy of making wage earner plans more attractive to debtors, especially as an alternative to full bankruptcy proceedings under Chapter 7. Therefore, the preferred status granted some creditors under section 1322(b)(2) was limited to holders of claims secured only by a security interest in the debtor's principal residence. No preferential treatment was given debts secured by property in addition to the debtor's principal residence. Such debts normally are incurred to make consumer purchases unrelated to the home or to enable the debtor to engage in some form of business adventure. In such circumstances the home is mortgaged not for its own sake, but for other purposes, and often is only one of several forms of security given. In a consumer purchase the creditor may also take a security interest in the goods purchased, or in a business transaction, the value of the home may be an insufficient security and, therefore, form only a part of the security package. Congress granted no extra protection for holders of these types of secured claims, presumably because any impact the bankruptcy laws might have upon them would not seriously affect the money market for home construction or purchase.
 
 
 42
 Furthermore, in sections 1322(b)(3) and (5), which permit the debtor's Chapter 13 plan to cure defaults, Congress provided no special exceptions for creditors whose claims are secured by a security interest in the debtor's residence. Congress expressly provided that subsection (b)(5), which allows the debtor to cure any default on mortgages that extended beyond the life of the Chapter 13 plan, is to operate "notwithstanding paragraph (2) of this subsection."[2]
 
 
 43
 We wish Congress had spoken its specific intent more clearly with respect to cases involving acceleration, judgments, or sales. It did not but instead saw fit to speak only in broad terms.[3] As is so obvious from the broad range of the cited lower court decisions, any particular result often reflects the value judgment of the particular court as to which of the two competing values should predominate, or at least which is more attractive under the specific facts of the case at hand. All courts agree that at some point in the foreclosure process, the right to cure a default is irretrievably lost; however, the statute itself provides no clear cut-off point except that which the courts may see fit to create. The closer that point of finality is to the beginning of the process, the greater is the protection accorded the mortgage holder, and, hence, the more attractive the home mortgage becomes as an investment. Conversely, the further down the line the court can reach to protect the debtor from the consequences of his default, the better the debtor's needs are met by the Chapter 13 proceedings, and the more attractive those proceedings become to such debtors.[4]
 
 
 44
 We despair of finding any clear-cut statutory language or legislative history that points unerringly to a construction of the statute that is free from challenge. Each of the cases and each result reached therein is subject to some objection either in theory or in practice. The result we reach here is, therefore, primarily a pragmatic one--one that we believe not only works the least violence to the competing concerns evident in the language of the statute but also one that is most readily capable of use. The event we choose as the cut-off date of the statutory right to cure defaults is the sale of the mortgaged premises. We pick this in preference to a number of other potential points in the progress of events ranging from the date of first default to the day the redemption period expires following sale. We do so for the following reasons, which admittedly may form a large target for criticism:
 
 
 45
 (a) The language of the statute is, to us, plainly a compromise, as we have earlier mentioned. Picking a date between the two extremes, is likewise a compromise of sorts.
 
 
 46
 (b) The sale of the mortgaged property is an event that all forms of foreclosure, however denominated, seem to have in common. Whether foreclosure is by judicial proceeding or by advertisement, and regardless of when original acceleration is deemed to have occurred, the date of sale is a measurable, identifiable event of importance in the relationship of the parties. It is at the heart of realization of the security.
 
 
 47
 (c) Although the purchaser at the sale is frequently the security holder itself, the sale introduces a new element--the change of ownership and, hence, the change of expectations--into the relationship which previously existed.
 
 
 48
 (d) The foreclosure sale normally comes only after considerable notice giving the debtor opportunity to take action by seeking alternative financing or by negotiating to cure the default or by taking advantage of the benefits of Chapter 13. Therefore, setting the date of sale as the cut-off point avoids most of what some courts have described as the "unseemly race to the courthouse." Concededly no scheme can avoid that possibility altogether, but the time and notice requirements incident to most sales at least provide breathing room and should deter precipitate action that might be expected if the cut-off date were measured by the fact of notice of acceleration or the fact of filing suit.
 
 
 49
 (e) Any earlier date meets with the complaint that the rights conferred by the statute upon debtors to cure defaults have been frustrated.
 
 
 50
 (f) Any later date meets with the objection that it largely obliterates the protection Congress intended for mortgagees of private homes as distinguished from other secured lenders.
 
 
 51
 (g) Any later date also brings with it the very serious danger that bidding at the sale itself, which should be arranged so as to yield the most attractive price, will be chilled; potential bidders may be discouraged if they cannot ascertain when, if ever, their interest will become finalized.
 
 
 52
 In so ruling we avoid any effort to analyze the transaction in terms of state property law. Modern practice varies so much from state to state that any effort to satisfy the existing concepts in one state may only create confusion in the next. Thus, in construing this federal statute, we think it unnecessary to justify our construction by holding that the sale "extinguishes" or "satisfies" the mortgage or the lien, or that the mortgage is somehow "merged" in the judgment or in the deed of sale under state law.
 
 III.
 A. Section 362(a)--Automatic Stay
 
 53
 The debtors in Miller and Pigloski argue that the automatic stay provisions of 11 U.S.C. Sec. 362(a) operate to toll the running of the statutory period for redeeming real estate sold at a foreclosure sale. Section 362(a) provides in pertinent part:
 
 
 54
 (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), operates as a stay, applicable to all entities, of--
 
 
 55
 (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
 
 
 56
 (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
 
 
 57
 (3) any act to obtain possession of property of the estate or of property from the estate;
 
 
 58
 (4) any act to create, perfect, or enforce any lien against property of the estate;
 
 
 59
 (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;
 
 
 60
 ....
 
 
 61
 An oft-quoted excerpt from the legislative history of section 362(a) indicates the provision's major purposes:
 
 
 62
 The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.
 
 
 63
 The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.
 
 
 64
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6296-97.
 
 
 65
 The district courts and bankruptcy courts disagree concerning whether the automatic stay provisions of section 362(a) toll state statutory foreclosure redemption periods. One line of cases has held that the limited automatic extension of time available under 11 U.S.C. Sec. 108(b)[5] precludes relief under section 362(a). Section 108(b) provides:
 
 
 66
 (b) Except as provided in subsection (a) of this section, if applicable law, an order entered in a proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of--
 
 
 67
 (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; and
 
 
 68
 (2) 60 days after the order for relief.[6]
 
 
 69
 In Bank of Commonwealth v. Bevan, 13 B.R. 989 (E.D.Mich.1981), the mortgagor filed a petition for reorganization under Chapter 11 of the Bankruptcy Code following a foreclosure sale of his home. The bankruptcy court had entered an order pursuant to section 362(a), indefinitely extending the statutory redemption period. In reviewing the bankruptcy court's order, the district court noted that "the language of Sec. 362(a) fails to explicitly address the running of time periods," id. at 992, while section 108 explicitly grants the trustee additional time in which to perform acts such as redemption. Reading the two sections together, the court held that the automatic stay provisions of section 362(a) do not override the extension of time provision in section 108(b). The court reasoned:
 
 
 70
 An interpretation of Sec. 362(a) as an indefinite stay of the statutory period of redemption would render Sec. 108(b) superfluous. If Sec. 362(a) automatically stays the running of the statutory right to redeem until the stay is lifted pursuant to Sec. 362(c) or (d), the pertinent time allotments of Sec. 108(b) are completely extraneous as statutory time periods designed to control the trustee's activity. Moreover, if Sec. 362(a) is interpreted to provide for the automatic stay of time periods for an indefinite amount of time, then subsections (a) and (b) of Sec. 108, which define minimum and maximum time periods for the trustee to act, directly conflict with Sec. 362(a).
 
 
 71
 Id. at 994. The court concluded that "where one section of the Bankruptcy Code explicitly governs an issue, another section should not be interpreted to cause an irreconcilable conflict."[7] Id.
 
 
 72
 Several courts have agreed with the Bevan court's interpretation of sections 108(b) and 362(a). See, e.g., Johnson v. First National Bank, 719 F.2d 270, 278 (8th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984); In re Cucumber Creek Development, Inc., 33 B.R. 820 (D.Colo.1983); In re Martinson, 26 B.R. 648 (D.N.D.1983); Matter of Markee, 31 B.R. 429 (Bankr.D.Idaho 1983); In re Construction Leasing & Investment Corp., 20 B.R. 546 (Bankr.M.D.Fla.1982); In re Murphy, 22 B.R. 663 (Bankr.D.Colo.1982).
 
 
 73
 In a recent case, the Bankruptcy Court for the Western District of Michigan considered whether the automatic stay of section 362(a) tolls the statutory redemption period in the context of Chapter 13. In re Wallace, 33 B.R. 29 (Bankr.W.D.Mich.1983). The debtor in Wallace had filed her Chapter 13 petition and plan following the foreclosure sale of her residence. In her plan, which was confirmed by the bankruptcy court, the debtor had proposed to make current payments on the mortgage on her residence outside the plan and to cure the default by making payments on the arrearage within the plan. When the debtor failed to make her payments under the plan, the bankruptcy case was dismissed. Approximately a month after the dismissal, the mortgagee notified the debtor that the redemption period had expired and asked her to vacate the house. The debtor refused, and the mortgagee sought a declaratory judgment that it was entitled to immediate possession of the property. The debtor argued, inter alia, that the automatic stay of section 362(a) had tolled the redemption period until the stay terminated upon dismissal of the case. The bankruptcy judge noted his earlier decision in In re Thompson, 17 B.R. 748 (Bankr.W.D.Mich.1982), that a Chapter 13 debtor could cure an arrearage and reinstate his mortgage even though a foreclosure sale had occurred before the petition was filed. However, he held that the right to cure and reinstate a mortgage was not based on any tolling of the redemption period. The bankruptcy judge concluded:
 
 
 74
 To adopt the tolling theory as proposed by Wallace could lead to results in Chapter 13 cases never intended by Congress. Thus, following the cases cited by her, the tolling period would cease when the discharge was granted in a completed case and thereafter when the redemption time had expired, even though a debtor were current in payments, the foreclosure sale would be final.
 
 
 75
 Therefore, I would hold that upon filing the petition, the automatic stay would only prevent action to recover possession and upon completion of the plan, the default would be cured and the position of the debtor and creditor would be the same as though the foreclosure had never occurred. If, however, the plan is not completed on dismissal, the mortgagee would have the same rights that he would have had if no Chapter 13 petition had been filed.
 
 
 76
 33 B.R. at 32.
 
 
 77
 Another line of cases, anchored by In re Jenkins, 19 B.R. 105 (D.Colo.1982), and In re Johnson, 8 B.R. 371 (Bankr.D.Minn.1981), takes the position that the automatic stay provisions of section 362(a) should be liberally construed to suspend the running of a statutory period of redemption. In Johnson an involuntary petition under Chapter 7 was filed against the mortgagor after three pieces of his real estate had been sold at a foreclosure sale. Following a hearing on a motion to prevent the running and termination of the redemption period, the bankruptcy court held that the automatic stay of section 362(a) operated to toll the redemption period. Because the legislative history of section 362(a) indicated that Congress intended to alter the scope of protection afforded by the stay provisions under the old Bankruptcy Act,[8] the court reasoned that the scope of section 362(a) could not be determined by reliance on cases decided under old law. Finding that the provisions of section 362(a) should be construed liberally "to give full protection to the debtor and creditors," 8 B.R. at 374, the court held that the redemption period was tolled by three separate subsections of section 362(a): subsection (a)(2), which stays "the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case"; subsection (a)(3), which stays "any act to obtain possession of property of the estate or of property from the estate"; and subsection (a)(4), which stays "any act to create, perfect, or enforce any lien against property of the estate." The court found no conflict between its interpretation of section 362(a) and the language of section 108(b). It held that the specific language of section 108(b) allowing the trustee time to act before "the end of such period, including any suspension of such period occurring on or after the commencement of the case," (emphasis added) expressly recognizes that the running of time may be suspended under section 362(a). Therefore, the Johnson court reasoned that section 108(b) did not govern the issue.
 
 
 78
 In Jenkins, the district judge did not discuss the relationship between section 108 and section 362; however, he did hold that in the context of a Chapter 11 proceeding, the automatic stay provisions of section 362(a)(1) and (a)(4) tolled the Colorado redemption period and prohibited the purchaser at the foreclosure sale from applying for a public trustee's deed on the property involved.
 
 
 79
 The district judge in Jenkins has subsequently altered his position on the automatic stay issue. In In re Cucumber Creek Development, Inc., 33 B.R. 820 (D.Colo.1983), he specifically considered whether the automatic stay provisions of section 362 could apply to toll a statutory redemption period in the face of the more specific provisions of section 108:
 
 
 80
 I have had an opportunity in the past to address this question in a slightly different context. In Re Jenkins, 19 B.R. 105 (D.C.Colo.1982). There, I ruled that Sec. 362(a)'s automatic stay tolled the state redemption period to preserve "those property rights which I have found to be possessed by the debtor at the time of filing." 19 B.R. at 110. In Jenkins, however, I did not discuss or consider the applicability of 11 U.S.C. Sec. 108 to such a case. Given an opportunity to consider the question here and to review the body of case law which has developed, I now conclude that Sec. 362(a) is inapplicable, and that state redemptive rights may be preserved and extended only to the extent provided by Sec. 108.
 
 
 81
 33 B.R. at 821.
 
 
 82
 Both Johnson and Jenkins were expressly disapproved by the only court of appeals to consider whether section 362(a) might apply to toll a statutory redemption period. Johnson v. First National Bank, 719 F.2d 270, 275 (8th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). In First National Bank, the mortgagors filed a joint petition for reorganization under Chapter 11 approximately three weeks before the expiration of the redemption period on their property that had been sold at a foreclosure sale. Relying upon 11 U.S.C. Sec. 105, the bankruptcy court enjoined the mortgagee from taking any further action to foreclose the property and ordered that the running of the statutory redemption period be stayed until further order or until the bankruptcy cases concerning the property were closed. The district court affirmed, and the mortgagee appealed. On appeal the debtors argued that although the district court relied solely upon section 105(a), the provisions of section 362(a) and section 108(b) also supported the bankruptcy court's order. With respect to setion 362(a), the Eighth Circuit accepted the reasoning in Bank of Commonwealth v. Bevan and expressly rejected the position taken in In re Jenkins and In re Johnson. The court found that the "clear majority" of cases decided under various automatic stay provisions of the old Bankruptcy Act held that the filing of a petition in bankruptcy did not toll or extend the running of a statutory period of redemption. Finding no clear manifestation of congressional intent to change the law on the issue, the court assumed that the newly-enacted statute, whose language was substantially identical to that of the previous statutes, was harmonious with existing law and its judicial construction. Moreover, the court found that the presence of section 108(b) in the Code supported its determination that section 362(a) did not apply to toll the Minnesota statutory redemption period.
 
 
 83
 We find ourselves in agreement with the reasoning of the Eighth Circuit in First National Bank and are reinforced in our conclusion by the belief that inter-circuit conflicts should be avoided wherever it is possible to do so in good faith and in reason.
 
 B. Section 105(a)
 
 84
 The debtors in Miller and Pigloski also contend that 11 U.S.C. Sec. 105(a) empowers bankruptcy courts to issue separate stay orders tolling statutory redemption periods. That section provides:
 
 
 85
 (a) The bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.
 
 
 86
 The minority position on this issue is set forth in Bank of Commonwealth v. Bevan, 13 B.R. 989 (E.D.Mich.1981). See also Bank of Ravenswood v. Patzold, 27 B.R. 542 (N.D.Ill.1982). After holding that section 362(a) did not apply, the district court in Bevan upheld the bankruptcy court's order tolling the statutory redemption period as a permissible exercise of authority under section 105. Relying on two cases decided under the Bankruptcy Act, the court found that the broad grant of power in section 105 authorized a bankruptcy judge, in appropriate situations, to grant the trustee "a greater period of time in which to act than Sec. 108 initially authorizes." 13 B.R. at 996.
 
 
 87
 Several courts have taken a contrary position, holding that section 105(a) may not be invoked to toll or suspend the running of a statutory redemption period absent fraud, mistake, accident, or erroneous conduct on the part of the foreclosing officer. Johnson v. First National Bank, 719 F.2d at 274; In re Martinson, 26 B.R. 648, 654 (D.N.D.1983); Matter of Markee, 31 B.R. 429, 432 (Bankr.D.Idaho 1983); In re James, 20 B.R. 145, 150-51 (Bankr.E.D.Mich.1982); In re Headley, 13 B.R. 295, 297-98 (Bankr.D.Colo.1981). In First National Bank, the Eighth Circuit reversed a district court judgment that had affirmed a bankruptcy court order entered under section 105(a) tolling the Minnesota redemption period. The court found that the equitable powers granted a bankruptcy court by section 105(a) are quite broad, but not unlimited. Specifically, the court found that, "absent a specific grant of authority from Congress or exceptional circumstances, a bankruptcy court may not exercise its equitable powers to create substantive rights which do not exist under state law." 719 F.2d at 274. The court concluded that to allow a bankruptcy court, as a matter of course, to suspend the running of a statutory period of redemption under section 105(a) would enlarge the debtor's property rights "beyond those specifically set forth by the Minnesota legislature and by Congress in Sec. 108(b)." Id. The Eighth Circuit was further persuaded by the fact that there was no claim of wrongdoing that adversely affected the debtor's ability to redeem the property within the statutory period:
 
 
 88
 "[E]quity is available to protect property rights of the innocent debtor from the wrongful acts of other persons; however, equity does not extend to situations in which the debtor is simply unable to make the required payment within the prescribed time."
 
 
 89
 Id. at 275 (quoting In re Headley, 13 B.R. 295, 297 (Bankr.D.Colo.1981)).
 
 
 90
 The bankruptcy court in In re James, 20 B.R. 145 (Bankr.E.D.Mich.1982), offered another reason for not interpreting section 105(a) to permit a bankruptcy court to toll state redemption periods as a matter of course. The court found it "clear" that section 105(a) and its predecessor, section 2(a)(15) of the Bankruptcy Act, were intended to affect parties' actions rather than state statutes:
 
 
 91
 "The chief test under ... Sec. 2(a)(15) appeared to be whether or not the proceeding in the nonbankruptcy court sought to be enjoined interfered with the possession or custody of the bankruptcy court or unduly impeded or embarrassed the court in its administration under the Act."
 
 
 92
 20 B.R. at 149-50 (quoting 2 Collier on Bankruptcy p 105.02 (15th ed.)). Absent some compelling justification, the court declined to use its equitable powers to interfere with state law by extending the redemption period.
 
 
 93
 Once again we are persuaded by the reasoning in First National Bank, and we note that the trend in the law seems to be away from allowing bankruptcy courts to issue orders tolling statutory redemption periods under authority of section 105(a). We also observe that the cases construing section 105(a) to confer no power to toll redemption periods absent exceptional circumstances appear to be more carefully reasoned than those holding to the contrary.
 
 IV.
 
 94
 The debtors in each of these appeals have raised additional separate issues which we now address.
 
 
 95
 A. The Farm Property Claim.
 
 
 96
 Our decision on the principal issue in this appeal likely will moot the question whether the residence of the Glenns should be treated separately from the fifty acres of farmland upon which it is located because the Glenns will be able to pursue their Chapter 13 plan as they propose. However, in the interest of completeness we address it briefly.
 
 
 97
 The Glenns' argument rests on the language of section 1322(b)(2). According to that section a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence ..." (emphasis added). The Glenns argue that since the creditors have a security interest in all of the land the Glenns own, including the fifty acres of farmland surrounding the house, the creditors do not have a claim secured only by real property that is the debtor's principal residence. The Glenns maintain, in other words, that the fifty acres of land on which their house is located are not part of their principal residence.
 
 
 98
 The only case we have found to address this issue is In re Ballard, 4 B.R. 271 (Bankr.E.D.Va.1980). After noting that neither of the debtors was engaged in farming and that the debtors received only $40 a month of income from the farm, the court in Ballard said that "in the absence of a showing that the Debtors clearly use the farm for any principal purpose other than their residence, [this court] must consider the entire ... property as their principal residence." Id. at 276.
 
 
 99
 This reasoning is even more persuasive here. It is undisputed that the Glenns do not use the fifty acres for any purpose other than as their principal residence. If the Glenns do not in fact put the land to any other use, it is difficult to see why the land should be found to be anything but a part of their residence for the purposes of Chapter 13.
 
 B. Redemption Under the Chapter 13 Plan
 
 100
 The debtors in Pigloski claim that even if they are not allowed to reinstate the terms of their mortgage under 11 U.S.C. Sec. 1322(b)(5), they are permitted, under section 1322(b)(3) to spread payment of the redemption price over the entire length of their Chapter 13 plan. The Pigloskis cite In re Kokkinis, 22 B.R. 353 (Bankr.N.D.Ill.1982), to support this proposition.
 
 
 101
 In Kokkinis the mortgagors filed their Chapter 13 petition after their residence had been sold at a foreclosure sale and one day before the statutory redemption period expired. The debtors proposed to pay both the arrearage and the entire remaining balance owed to the mortgagee over the life of their plan. The primary issue was whether the provisions of section 1322(b) allowed the debtors to cure default after pre-petition acceleration of the mortgage debt. The court held that they did. The court distinguished two cases in which the debtors had been precluded from curing arrearages following foreclosure sales because the debtors in those cases wanted to reinstate to original payment plans under mortgages while the debtors in Kokkinis proposed to pay off the entire debt during the life of their plan.
 
 
 102
 Although it is possible, in theory, to hold that a Chapter 13 debtor is entitled to pay the redemption amount over the life of his plan and also to hold that the statutory redemption period is not tolled by the bankruptcy proceeding,[9] the practical effect of allowing the debtor to pay the redemption amount over an extended period would in many respects be the same as a suspension of the redemption period. Furthermore, most of the considerations that cut against allowing the debtor to reinstate the mortgage terms after a foreclosure sale also argue against allowing the debtor to pay off the redemption amount over the life of the plan. We, therefore, decline to accept this view.
 
 
 103
 C. Preferential Transfer Under 11 U.S.C. Sec. 547(b)
 
 
 104
 As an alternative basis for affirming the district court in his case, the debtor in Miller argues that the expiration of the redemption period following a foreclosure sale would constitute a preferential transfer that may be avoided under 11 U.S.C. Sec. 547(b). The mortgagee in Miller argues that this is a new issue not raised or briefed in the lower courts and that it ought not to be decided without a full opportunity for briefing and litigation in the lower courts. The mortgagee also argues that the debtor violated court rules by raising an issue in his appellee brief when he had not given notice that the issue would be raised before the briefs were written.
 
 
 105
 This is a novel issue at best and one which was neither raised nor briefed in the lower courts. It implicates entirely new provisions of the Bankruptcy Code and factual issues which were neither developed nor otherwise addressed in that context. It would be entirely inappropriate for us to consider that issue in this appeal. Bannert v. American Can Company, 525 F.2d 104, 111 (6th Cir.1975).
 
 V.
 
 106
 In summary, we hold that under 11 U.S.C. Sec. 1322(b) a Chapter 13 debtor may cure a default on a mortgage on his principal residence even when the debt has been accelerated and a judgment of foreclosure has been entered provided that no foreclosure sale has taken place. Once the property has been sold, the right to cure the default and reinstate the terms of the mortgage under section 1322(b) ceases. We also hold that the automatic stay provisions of 11 U.S.C. Sec. 362(a) do not toll or extend the running of state statutory periods of redemption following foreclosure sales. Moreover, 11 U.S.C. Sec. 105(a) does not empower the courts to issue separate orders tolling statutory redemption periods absent exceptional circumstances such as fraud, mistake, accident, or erroneous conduct. Finally, we hold that section 1322(b)(3) does not permit debtors to spread payment of redemption amounts over the entire life of their Chapter 13 plans.
 
 
 107
 Applying the foregoing principles to the specific cases on appeal, we reach the following dispositions:
 
 
 108
 GLENN (82-3821). While the mortgagee had succeeded in obtaining a judgment of foreclosure, sale of the premises had not occurred at the time the Chapter 13 petition was filed. Accordingly, the judgment of the bankruptcy court overruling the bank's objections and confirming the plan of the debtors is AFFIRMED.
 
 
 109
 MILLER (83-1585). Because the sheriff's sale had already been held before the Chapter 13 petition was filed, the bankruptcy court was correct in lifting the automatic stay as to First Federal. Therefore, the judgment of the district court is VACATED and we REMAND to the district court with directions to remand to the bankruptcy court for reinstatement of the order from which appeal was taken to the district court and for further proceedings consistent with this opinion.
 
 
 110
 PIGLOSKI (83-1316). As in Miller, the sheriff's sale in this case was held before the debtors filed their Chapter 13 petition. District Judge Boyle was, therefore, correct in ruling that the automatic stay provisions of 11 U.S.C. Sec. 362(a) did not toll the statutory redemption period and in holding that, following the foreclosure sale, the mortgage default was not subject to cure under section 1322(b)(5) apart from paying the redemption price within the period prescribed by state law. Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 This language appeared in the Senate version of the bill, S. 2266, 95th Cong., 2d Sess. Sec. 1322 (1978), not long after Senate committee hearings at which Edward J. Kulik, representing the Real Estate Division of Massachusetts Mutual Life Insurance Company, testified that Chapter 13, as then proposed, might have the unintended effect of restricting the flow of home mortgage money. See Bankruptcy Reform Act of 1978: Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary, 95th Cong., 1st Sess. 707, 714-15 (1977) (statement of Edward J. Kulik, Senior Vice-President, Real Estate Division, Massachusetts Mutual Life Ins. Co.). Specifically, Mr. Kulik was concerned that provisions (1) allowing modification of rights of holders of secured claims and (2) protecting guarantors and codebtors as well as the Chapter 13 debtor might have this effect. He urged:
 Serious consideration should be given to modifying both bills so that, at the least: One, a mortgage on real property other than investment property may not be modified, and two, providing that the stay of actions against a guarantor or other codebtor is applicable only to guarantees executed after the effective date of the new legislation.
 Id. at 714.
 In response to Senator DeConcini's comments questioning the severity of the problem, Robert E. O'Malley, Mr. Kulik's counsel, stated:
 With respect to the savings and loans, in particular, and the future prospects for loans to individuals under the proposed bills, there is really only one basic problem. That is, the provision in both bills that provides for modification of the rights of the secured creditor on residential mortgages, a provision that is not contained in present law.
 I think the answer to your question is that, of course, savings and loans will continue to make loans to individual homeowners, but they will tend to be, I believe, extraordinarily conservative and more conservative than they are now in the flow of credit.
 It seems to me they will have to recognize that there is an additional business risk presented by either or both of these two bills if the Congress enacts chapter XIII in the form proposed, thus providing for the possibility of modification of the rights of the secured creditor in the residential mortgage area.
 I think the answer is that they will be much more conservative than they have been in the past.
 Id. at 715 (statement of Robert E. O'Malley, Attorney, Covington & Burling).
 
 
 [2]
 The Senate added the "notwithstanding paragraph (2)" language to subsection (b)(5) when it amended subsection (b)(2) to prohibit modification of the rights of creditors whose claims are secured only by a security interest in the debtor's principal residence
 There is some disagreement about whether the "notwithstanding" clause was necessary. Compare Grubbs v. Houston First American Savings Association, 730 F.2d 236, 246 (5th Cir.1984), with In re Williams, 11 B.R. 504, 506 (Bankr.S.D.Tex.1981). Whether the clause was necessary or not, it does indicate that Congress did not want the language of subsection (b)(2) to interfere with a debtor's right to cure default on a long-term mortgage under subsection (b)(5).
 
 
 [3]
 One justification may be found in the fact that state laws, practices and even terminology vary extensively. Any effort to be more specific in one context may only brew uncertainty elsewhere
 
 
 [4]
 We think that the other provisions of section 1322(b) indirectly assist the debtor in his quest to salvage his home. By modifying the terms of some debts and curing defaults generally over a longer period of time without incurring more adverse consequences, a Chapter 13 plan may free up additional money to aid the debtor in curing a default on his home mortgage
 
 
 [5]
 Neither Miller nor the Pigloskis have claimed any benefit from the provisions of section 108(b)
 
 
 [6]
 In a voluntary case, the entry of the order for relief is the filing of the petition commencing the case. S.Rep. No. 598, 95th Cong., 1st Sess. 28 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5814
 
 
 [7]
 Although it determined that the bankruptcy court incorrectly cited section 362(a) as the basis for its order tolling the redemption period, the district court affirmed the bankruptcy court's action, holding that the stay was a permissible exercise of the broad grant of discretionary authority embodied in section 105. 13 B.R. at 996. That aspect of the Bevan opinion is discussed at Part III.B., post, at 1440
 
 
 [8]
 The court relied specifically on this statement from House Report No. 595:
 The provisions in the current Bankruptcy Act for a stay of actions against the debtor and his property upon the commencement of a bankruptcy, reorganization, or repayment plan case are inadequate ... The stay is an important aspect of bankruptcy protection, and is an element of the debtor's fresh start ....
 ... The automatic stay in H.R. 8200 differs in some ways from the stays provided by the Rules of Bankruptcy Procedure today. The new stay expands coverage in some areas, reduces it in others, and clarifies many uncertain aspects of the current provisions.
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 174 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 6135 (footnotes omitted).
 
 
 [9]
 See In re Wallace, 33 B.R. 29 (Bankr.W.D.Mich.1983), in which the bankruptcy judge rejected a tolling theory even though he had held in an earlier case that section 1322(b) allows a Chapter 13 debtor to cure a default and reinstate the terms of a mortgage after a foreclosure sale has occurred